# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**TYLER JONES,**

    **Plaintiff,**

  v.          Case No. 18-CV-709

**CITY OF SHEBOYGAN,**

    **Defendant.**

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

  Plaintiff Tyler Jones was a maintenance worker for defendant City of Sheboygan. While driving a City of Sheboygan garbage truck, he collided with another City of Sheboygan garbage truck. As a result, he was fired. In this lawsuit, Jones alleges that he was the victim of race discrimination. The City of Sheboygan has moved for summary judgment. Briefing on the motion is complete and the matter is ready for resolution. All parties have consented to the jurisdiction of a magistrate judge.

## BACKGROUND

  Jones began his employment with the City of Sheboygan on March 20, 2017. His title was Maintenance Worker I. His job duties included collecting garbage and operating

garbage collection equipment. As an employee of the City of Sheboygan, Jones was given an Employee Handbook, which provided in relevant part that the "[f]ailure to follow safety requirements is a serious offense, subject to corrective action and/or further discipline, including termination of employment, for even the first offense (depending on the degree of the violation)." Jones was also given an Orientation Checklist for Sanitation Operators, which stated that, "[w]hen backing, go slow and use a spotter."

In the weeks that followed his first day of employment, Jones was trained as part of a sanitation crew. The City generally uses two-man sanitation crews. One sanitation crew member drives the garbage truck for thirty minutes while the other member loads garbage and recycling onto the garbage truck. At the end of thirty minutes, the crew members switch places. This is repeated until the daily route has been completed. When the truck is full and when the daily route is complete, the crew members take the garbage truck to the Waste Management Transfer Station in Sheboygan Falls, Wisconsin (the "Transfer Station") to empty it.

Part of the training Jones received was how to operate a garbage truck at the City's Transfer Station. When the garbage truck arrives at the Transfer Station, it is driven forward onto a scale, a card specific to the garbage truck is swiped in a card reader, and the truck's initial weight is taken. The driver of the garbage truck then pulls forward from the scale, positions the truck so it is in front of a building at the Transfer Station where garbage and recycling are dumped or "tipped," and then backs up so that the garbage

2

side of the truck can be dumped into the Tipping Building. Once the garbage has been emptied, the driver drives the truck back to the scale, swipes another card in the card reader, and the truck is again weighed so that the weight of the garbage can be determined. After the garbage weight has been determined, the garbage truck pulls forward from the scale and then backs up so that the recycling side of the truck can be emptied into the Tipping Building. Once the recycling has been emptied, the members drive forward and continue on the daily route or return to the City's Municipal Services Building.

So as to be able to operate the City's garbage trucks, Jones received training on operating commercial vehicles and received his Commercial Driver's License in May 2017. Shortly thereafter, on June 8, 2017, Jones was assigned to work as one half of a two-man sanitation crew. When the garbage truck became full, Jones drove it to the Transfer Station to be weighed and emptied. After emptying the garbage side of the garbage truck into the Tipping Building, Jones pulled forward and attempted to back up onto the scale to determine the garbage weight. In doing so, he drove backward without a spotter, in one continuous motion at three to five miles per hour. The space directly behind the garbage truck is a blind spot in the truck's mirrors. However, the truck is equipped with a backup camera. When backing his garbage truck onto the scale, Jones's garbage truck collided with another City garbage truck, driven by James Gilliam, another City of Sheboygan employee. Gilliam's garbage truck was pulling onto the scale when Jones's

3

garbage truck was backing onto the scale. Gilliam's truck had come to a complete stop on the scale before Jones backed into it.

The rear step of Jones's garbage truck punctured the radiator of Gilliam's garbage truck, causing more than $13,000 in damage to Gilliams' truck. The collision rendered Gilliam's garbage truck inoperable, and it needed to be towed. Bruce Matzdorf, the City's Department of Public Works' Streets and Sanitation Leadman, upon learning of the collision, went to the Transfer Station. Matzdorf took Jones, who is white, for a post-accident drug test. He did not take Gilliam, who is African-American, for a post-accident drug test. Both Jones and Gilliam gave the City written statements regarding the accident. The City obtained video of the accident from Waste Management's cameras. Sandra Rohrick, the City's Director of Human Resources and Labor Relations, spoke with Tom Ross, who was in Gilliam's garbage truck at the time of the collision, and Jason Brill, who was the other member of Jones's sanitation crew on June 8, 2017.

David Biebel, the City's Director of Public Works, Rohrick, and Jason Blasiola, the City's Streets and Sanitation Superintendent (collectively, "City Management"), reviewed the information gathered. City Management concluded that Jones violated work rules when he backed his vehicle without a spotter. City Management also concluded that Jones's inattentive driving was the cause of the accident. They also concluded that Gilliam could not have safely backed up in accordance with the City's work rules once he stopped. Because of the severity and avoidability of the accident, City

Management was no longer comfortable with Jones operating vehicles for the City. Because the Maintenance Worker I duties require, at least from time to time, operating large vehicles, City Management did not believe that reassigning Jones was a viable solution to its concerns. As a result, the City terminated Jones employment on June 20, 2017.

In this lawsuit Jones alleges that the City of Sheboygan discriminated against him on the basis of race and color when it terminated his employment. The City has moved for summary judgment.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the

evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

**ANALYSIS**

The City contends that it had a legitimate reason for terminating Jones: because he caused a serious and avoidable accident. It contends that his race and color were not a factor in the City's decision. Much of the City's brief in support of its motion for summary judgment focuses on the allegations in Jones's complaint, arguing that Jones "has not pled facts to suggest the City discriminates against whites" (ECF No. 23 at 23) and Jones "has not pled facts to show he was treated worse than similarly situated non-white employees" (*id.* at 25). But the sufficiency of the complaint is a matter for a motion to dismiss; at summary judgment the issue is whether the evidence establishes that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). If there is not, then the City is entitled to summary judgment.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual…because of such individual's race…." 42 U.S.C. § 2000e-2(a)(1). An employee may show illegal discrimination through direct proof or, in the absence of direct proof, an employee may make a case with sufficient indirect proof and, upon doing so, switch the burden to the employer. *Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003).

6

Jones does not offer any direct evidence of racial discrimination. Thus, the question is whether he has established a prima facie case of racial discrimination through indirect evidence.

The first test developed by the Supreme Court for showing employment discrimination through indirect proof was established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under *McDonnell Douglas,* the plaintiff must first demonstrate facts that build a prima facie case of discrimination by showing (1) that he belongs to a racial minority, (2) that he applied and was qualified for a job for which the employer was seeking applicants, (3) that, despite his qualifications, he was rejected, and (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. 411 U.S. at 802. Once a prima facie case is established, a presumption of discrimination is triggered. "The burden then must shift to the employer to articulate some legitimate, non-discriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802. If the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a "pretext," which in turn permits an inference of unlawful discrimination. *Id*. at 804.

The *McDonnell Douglas* test has been modified to apply to situations (like this one) in which a member of a majority group contends that he was subject to employment discrimination. To survive summary judgment, a member of a majority group must show: (1) "background circumstances exist to show an inference that the employer has

reason or inclination to discriminate invidiously against whites or evidence that there is something 'fishy' about the facts at hand"; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated individuals who are not members of his protected class. *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016) (citing *Balance v. City of Springfield*, 424 F.3d 64, 617 (7th Cir. 2005)).

As the City points out in its reply brief (ECF No. 37 at 6-7), Jones makes no attempt to point to background circumstances that show an inference that the City had reason or inclination to discriminate invidiously against whites, nor does he point to evidence that there is something "fishy" about the facts at hand. *See Formella*, 817 F.3d at 511-12. Having failed to present any argument in his opposition to the City's motion for summary judgment regarding any background circumstances showing the City had a reason to discriminate against whites, or anything fishy about the facts of his case, Jones has waived any argument as to the first prong of a prima facie case of discrimination. *Id.*

Even ignoring the fact that Jones has not even made an attempt to prove the first prong of a prima facie case, there is no evidence that would support a finding that the City has reason or inclination to discriminate invidiously against whites or that there is something "fishy" about the facts at hand. Jones worked for the City for only three months. Since Gilliam is apparently "the City's only black employee" (ECF No. 30, ¶ 51), the person or persons who hired Jones were the same race as Jones (white), as were the

8

persons who fired him. Indeed, all City employees other than Gilliam are white. Jones points to absolutely nothing suggesting that the City, led by white employees, had a reason to discriminate against a white employee (Jones) that it had just hired. *See Phelan*, 347 F.3d at 685 (holding that where plaintiff was white, his superiors were white, and his replacement was white, plaintiff was unable to present the necessary "background circumstances" to believe his superiors were inclined to discriminate against white men).

Jones speculates that the City fired him rather than Gilliam because Gilliam "would have had an easier lawsuit against the City than Mr. Jones if Mr. Gilliam had been terminated." (ECF No. 35 at 15.) Gilliam probably would have had an easier discrimination lawsuit had he been fired. But that certainly does not mean Jones suffered discrimination. Not only was Gilliam the City's only black employee, but the evidence strongly supports the conclusion that Jones was significantly more at fault for the accident. If the City had fired its only black employee, citing an accident for which he was not at fault, but retained the recently-hired white employee who was at fault, there would be an obvious claim of discrimination. The evidence is that, shortly after getting his commercial driver's license, Jones got into an accident that resulted in substantial damage to one of the City's garbage trucks. So the City decided to let him go. Nothing about that termination decision looks "fishy."

Nor does Jones make any attempt to show that he was meeting the City's legitimate performance expectations, the second prong of a prima facie case of

discrimination. The accident occurred shortly after he began working for the City. He had just obtained his commercial driver's license. He had not worked for the City long enough to establish that he was meeting the City's expectations, which no doubt is why he makes no effort to argue that he was.

And while he argues that he was treated less favorably than Gilliam, the fourth prong of a prima facie case of discrimination, all Jones offers to show that he and Gilliam are similarly situated is that they were both employed by the City as Maintenance Worker I. "Similarly situated employees must be directly comparable to the plaintiff in all material respects." *Good v. University of Chicago Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012). The goal of the comparison analysis is to "eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable'—discriminatory animus." *Id.* (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd,* 553 U.S. 442 (2008)). All Jones tells us about Gilliam is that he is African-American, performed the same job, under the same supervisor, and received the same training under Bruce Maztdirf. (ECF No. 35 at 16.) He says nothing about how long Gilliam had worked for the City at the time of the accident—an important fact given Jones's very brief time with the City. And although Jones references other "accidents" that Gilliam was involved in, he provides no details of when the accidents occurred, what happened, what (if any) damage was incurred, or what Gilliam's role in the accidents was. Without that information, the

reference to these other accidents is of no probative value whatsoever. In short, Jones has not established that he, as a brand new City employee, was similarly situated to Gilliam at the time of the accident.

Even if Jones had met his burden and established a prima facie case of discrimination, he cannot show that the City's reason for terminating his employment was pretextual. "Pretext requires more than showing that the decision was mistaken, ill considered or foolish[.]" *Ballance*, 424 F.3d at 617 (internal quotation marks omitted). The question is not whether the employer's stated reason was inaccurate or unfair, "but whether the employer honestly believed the reasons it has offered to explain the discharge." *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)). "[I]t is not 'the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie.'" *Ineichen V. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005) (quoting *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000)). To meet this burden, Jones must "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in the City's asserted reason for his termination "that a reasonable person could find [it] unworthy of credence." *Coleman*, 667 F.3d at 852 (quoting *Bouhmedi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).

Jones does not identify any weakness, implausibility, inconsistency or contradiction in the City's explanation for his termination such that a reasonable person could the explanation unworthy of credence. All Jones offers in support of his position that he was not at fault is his own opinion. (*See* ECF No. 35 at 15 ("Mr. Jones did not think it would be reasonable to conclude that he was at fault for the accident and Mr. Gilliam was not."; "Mr. Jones felt he should not be responsible for any damages to Mr. Gilliam's garbage truck.").) He cites to no evidence upon which the jury could rely to conclude that the accident was not his fault. Even if he could, the issue is not whether the accident was his fault. The issue is whether the City believed the accident was Jones's fault. If it did, even if it was wrong, and if its belief that Jones caused the accident was the reason it fired him, there was no discrimination. Jones points to no evidence that the City is lying when it says that it concluded the accident was his fault, and that it fired him for that reason.

In short, the undisputed evidence is that, shortly after being hired, Jones backed his garbage truck into another stationary truck, causing significant damage. Notwithstanding the blind spots in the truck's mirrors, Jones should have been able to easily avoid the accident had he been paying attention to the backup camera and using a spotter as City policies required. The fact that the City fired Jones and not the black employee who was driving the truck Jones hit does not even hint of discrimination. Jones has not identified the existence of any genuine dispute of material fact that precludes the

entry of summary judgment for the City. For that reason, the City's motion will be granted.

**IT IS THEREFORE ORDERED** that the City of Sheboygan's Motion for Summary Judgment (ECF No. 22) is granted and this action is dismissed. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 13th day of August, 2019.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge